# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| THE STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>KARIS LOUISE MILES,<br><br>Appellant. | No. 86351-7-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

BIRK, J. — In 2021, a fight occurred between Karis Miles, Craig Davis, Edward (Ed) Davis, and Kay Davis.[1] Ed and Kay are the parents of Miles's partner, Craig. A jury convicted Miles of assault in the third and fourth degrees for her actions against Ed and Kay respectively. The jury rejected domestic violence designations for both counts by finding Miles and the parents were not "members of the same family or household." On appeal, Miles argues the court violated her right to present a defense by refusing to admit evidence Craig pleaded guilty to assaulting Ed in the same fight. She also claims the court's refusal to dismiss the domestic violence designations was unduly prejudicial and that the court violated the real facts doctrine at sentencing by considering uncharged acts. We affirm.

---

[1] For clarity, we use the Davises' first names. No disrespect is intended.

I

In 2021, a fight occurred between Ed, Kay, Miles, and Craig. Ed and Kay are the elderly parents of Craig. Miles and Craig are romantically involved.

On October 16, 2021, Miles drove Craig's work van to his parents' home. Craig was passed out in the passenger seat of the van. Miles stopped the van in the parents' driveway. Ed exited the home alone and approached the van. Miles and Ed began physically fighting. Craig woke up and tried to assist Miles. Kay exited the home after calling 911[2] and witnessed the fight firsthand. Miles and Kay interacted at some point. Law enforcement arrested Miles and Craig. Miles and the parents went to the hospital for their injuries[3] but were not admitted overnight.

Miles and Craig's parents each provided their account of the fight at trial. Craig did not testify.[4]

Ed testified that Miles started throwing objects, including a crock-pot, near him as he approached the van. Miles then spit on Ed, ripped his skin by digging her nails into his forearms, and kicked him in the head after he fell to the ground. After Ed fell to the ground, Craig also got "on top" of Ed.

---

[2] The parties submitted recordings of the two 911 calls made by Kay, portions of which were played at trial. On the 911 call, Kay claimed both Craig and Miles attacked Ed.

[3] The parties also submitted numerous photos of the parents' injuries and the scene of the fight, each taken soon after the fight's conclusion.

[4] Miles initially noted Craig as a defense witness. However, Miles ultimately did not call Craig as a witness.

Kay testified she went outside after calling 911 and witnessing Miles kicking Ed in the head. Miles then approached Kay and threw Kay's phone on the ground, which disconnected the 911 call. Then, Miles grabbed Kay's arm, threw her to the ground, and bit Kay's hand. Craig followed Miles back to Ed, who was still on the ground. Miles then began kicking Ed again before both she and Craig started punching Ed. Kay ran back inside to answer the phone and spoke to the same 911 operator.

Miles testified Ed aggressively approached the van, batted away a crock-pot, and threw a book as she attempted to give both to him. Ed then grabbed Miles's neck and punched her in the eye. Miles bit Ed's thumb in an attempt to defend herself. Craig approached Ed, shoved him to the ground, and started punching him in the head. Miles stated she was never involved in the fight between Craig and Ed. Miles then got out of the van and saw Kay approaching Craig and Ed. Miles states she then "incidental[y]" collided with Kay after only intending to block her path. Ed then got up and took Miles to the ground, after which Craig separated Ed from Miles.

The State charged Miles with assault in the third and fourth degrees for her actions against Ed and Kay respectively. For both charges, the State sought domestic violence designations, alleging, "Miles, at said time of committing the above crime against a family or household member . . . , which is a crime of domestic violence."[5]

---

[5] Police reports reflect that at the time of the charging documents, Miles and Craig had been described to them as married.

Craig pleaded guilty to assault in the fourth degree for his actions against Ed. Miles attempted to admit documents concerning Craig's guilty plea, including his judgment and sentence, plea agreement, and an attachment titled "Craig Davis Testimony," which contained his account of the fight. The court refused to admit these documents primarily for irrelevance and hearsay and also limited Miles's ability to elicit testimony about them.

After the State rested, Miles unsuccessfully moved to dismiss the State's domestic violence designations for insufficient evidence. The court cited "the fact that the witnesses and at least Kay Davis last testified that—that she heard from the couple that they were married."

The jury convicted Miles on both assault charges. The jury rejected domestic violence designations for both charges by answering "no" on both special verdict forms asking whether Miles and the parent were "members of the same family or household?"

At sentencing, the court acknowledged receiving numerous letters from individuals discussing their past experiences with Miles and permitted four individuals to speak at the sentencing hearing. Miles contested the reliability of these statements, but cited the letters to argue she needed mental health treatment.

The court imposed a three-month sentence at the top of Miles's standard range for assault in the third degree, a felony under RCW 9A.36.031(2), and imposed a consecutive 364-day sentence for assault in the fourth degree, a gross misdemeanor under RCW 9A.36.041(2), suspended on condition of Miles serving

four months in jail and 24 months of unsupervised probation, among other conditions. Miles appeals.

II

Miles first argues the court violated her right to present a defense. She challenges the court's refusal to admit "certified public records of [Craig]'s conviction for assault stemming from this same incident," and argues these documents were "probative to whether [Miles] was the person responsible for causing the injuries [Ed] sustained, injuries for which he blamed [Miles]." Miles argues, "Craig admitted he caused these injuries yet his parents downplayed Craig's involvement while insisting [Miles] was responsible," making his plea "an important part of [Miles]'s ability to counter the prosecution's efforts to paint her as responsible."

"A criminal defendant's right to present a defense is guaranteed by both the federal and state constitutions." State v. Jennings, 199 Wn.2d 53, 63, 502 P.3d 1255 (2022); U.S. CONST. amend. VI; CONST. art. I, § 22. "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations" and the "rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process." Chambers v. Mississippi, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973).

We employ a two-part test for determining whether a defendant's right to present a defense has been violated. Jennings, 199 Wn.2d at 58. First, we "analyze[] the trial court's evidentiary rulings for abuse of discretion." Id. Second, we "consider de novo the constitutional question of whether these rulings deprived [the defendant] of her Sixth Amendment right to present a defense." State v. Arndt, 194 Wn.2d 784, 797-98, 453 P.3d 696 (2019).

"When the evidentiary ruling constitutes an abuse of discretion that results in prejudice, the analysis ends [t]here." State v. Broussard, 25 Wn. App. 2d 781, 786, 525 P.3d 615 (2023). "However, if the ruling was either within the trial court's discretion or an abuse of discretion but harmless, the review proceeds to step two, reaching the constitutional question." Id.

A

Pretrial, Miles "move[d] to introduce a certified copy of the Judgment and Sentence and Statement of Defendant on Plea of Guilty," where Craig pleaded guilty to assault in the fourth degree against Ed for the same fight.

The statement of defendant on plea of guilty included an attachment titled "Craig Davis Testimony" in which Craig provided a written account of the fight. Craig said Ed attacked Miles as he "angers easily and has a temper," after which Craig defended Miles by pulling Ed off of her, throwing Ed to the ground, and then punching Ed. Craig portrayed himself as acting alone when responding to Ed's aggression.

6

Miles argued the "proffered documents are admissible as court records under RCW 5.44.010 and as certified public records under RCW 5.44.040." She argued "the fact that [Craig] was adjudicated guilty for assaulting Ed . . . goes to not only Defense's theory of what happened here, but also to the motivations of the State witnesses in this case." She argued the evidence was relevant to show "somebody else was responsible for the injuries," and to demonstrate "Ed and Kay Davis were seeking to . . . absolve their son of responsibility" or "at least reduce the gravity of the consequences that he would be facing."

The court refused to admit Craig's plea as evidence on two grounds:

First, as to "just general relevance to guilt or innocence, I'm ruling that it's not relevant." Citing State v. Campbell, 296 N.C. 394, 250 S.E.2d 228 (1979) and State v. Kerley, 246 N.C. 157, 97 S.E.2d 876 (1957), the court referred to "cases that talked about the relevance of a codefendant's conviction to a case that's occurring subsequently . . . [a]nd a lot of cases are indicating that it's not." The court concluded that "in terms of just admitting it primarily as a defense on the issue of guilt or not guilty I'm going to hold that it's not relevant and therefore not admissible."

Second, the court explained that while RCW 5.44.010 may cover "something that's routine within the court, including conviction," the "add-ons" to the plea were "beyond the line of what would be admissible" under RCW 5.44.010. "[T]hat amount of detail of a testimonial nature wouldn't be appropriate to be admissible over a hearsay objection under RCW 5.44.010."

B

During Miles's cross-examination of Ed, the following exchange occurred, to which the State objected:

> Q. Now, you're aware your son, Craig, was also charged with a crime from this incident?
> A. Yes.
> Q. Related to these assault charges?
> A. Yes.
> Q. And that he already pleaded guilty?
> A. Yes.
> Q. He took a deal from the prosecutor's office?

After a sidebar, the court stated, "I am going to instruct the jury to disregard fact of conviction. I'm going to allow [Miles] to ask the witness if it—I mean, we've talked about it as glad he didn't have to testify [against] his son or if he didn't want to testify against his son," and limited Miles to asking about Ed's "reluctance to testify against his son." As testimony resumed, Miles asked the following:

> Q. So, Mr. Davis, you didn't want to have to testify against your son?
> A. Well, I didn't know he did anything, so how could I testify?
> Q. Okay. And you didn't want to have to be put in that position?
> A. Well I—I knew he was on top of me, but I—that's the only thing I remember.
> Q. Okay. Well, let me just ask you: In that interview that you previously gave to Defense, you had said you didn't want to be in that position of testifying against your son?
> A. I could've said that. Yes.

Miles also asked Kay about her reaction to not testifying against Craig:

> Q. When you learned you weren't going to have to testify against Craig, you were relieved for him?
> A. Yes.
> Q. You also felt relieved for you?
> A. Yes.
> Q. You felt relieved for Ed?

> A.  Yes.
> . . . .
> Q.  You felt that would be best for your family?
> A.  Yes.

Miles later attempted to discuss Craig's plea during her own testimony.

> Q.  Okay.  And your testimony is that Craig Davis was punching him for minutes?
> A.  That's correct.  He ple[aded] guilty to that.

The State objected and the court instructed the jury "to disregard any evidence about Craig Davis pleading or being convicted."

During Miles's closing argument, she asserted Craig was the "drunkest his mom had ever seen any person, who was reportedly punching and kicking his dad, and himself charged with assault from this incident."  The State objected, and the court "instruct[ed] the jury to disregard any information regarding Craig Davis, but as to proceeding, conviction, or plea."

## C

"Trial courts determine whether evidence is relevant and admissible, and appellate courts review the trial court's rulings for abuse of discretion."  Jennings, 199 Wn.2d at 59.  A court abuses its discretion when its evidentiary ruling is manifestly unreasonable or exercised on untenable grounds or for untenable reasons.  Broussard, 25 Wn. App. 2d at 787.  A decision that is either contrary to law or based on an incorrect application of an evidentiary rule is an abuse of discretion.  Id. at 787-88.

9

1

We first address the court's evidentiary ruling excluding the fact Craig pleaded guilty to assaulting Ed, which the court concluded was "not relevant" to determining Miles's "general . . . guilt or innocence."

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  ER 401. "Evidence which is not relevant is not admissible."  ER 402.  The "threshold to admit relevant evidence is very low" and "[e]ven minimally relevant evidence is admissible."  State v. Darden, 145 Wn.2d 612, 621, 41 P.3d 1189 (2002). "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  ER 403.

The court looked to two decisions that addressed the admissibility of a co-defendant's conviction.  Kerley, 246 N.C. at 159; Campbell, 296 N.C. at 399. According to the court's syllabus, Kerley involved two defendants accused of assaulting their victim to facilitate a robbery.  246 N.C. at 157-58.  Even when the two defendants "were indicted jointly, the crime was several in nature," meaning "[i]f one were convicted or pleaded guilty, this would not be evidence of the guilt of the other; nor would the acquittal of one be evidence of the innocence of the other." Id. at 159.  Like Kerley, Campbell stands for the proposition that a "defendant's guilt must be determined solely on the basis of the evidence presented against

10

him, and it is improper to make reference to the disposition of charges against a codefendant." 296 N.C. at 399. In both cases, the State sought to use a codefendant's conviction against the defendant. Kerley, 246 N.C. at 161-62; Campbell, 296 N.C. at 399. Underlying this rule is the defendant's Sixth Amendment confrontation right. See Kerley, 246 N.C. at 159 (citing Kirby v. United States, 174 U.S. 47, 19 S. Ct. 574, 43 L. Ed. 890 (1899)).[6]

On the other hand, in Chambers, the State accused Chambers of murdering a police officer with a pistol. 410 U.S. at 286-87. Another person, McDonald, gave a sworn confession that he shot the officer using his own pistol, though he later repudiated this. Id. at 287-88. At trial, the court blocked Chambers's attempts to question McDonald and other witnesses about the confession and repudiation. Id. at 291-92. This was based on a "Mississippi common-law rule that a party may not impeach his own witness." Id. at 295. The United States Supreme Court found a constitutional violation, because the rule "plainly interfered with Chambers' right to defend against the State's charges." Id. at 298.

Miles likens her case to Chambers, arguing that blocking Craig's guilty plea denied her the opportunity to present her theory of the fight. But the analogy is inapt. In Chambers, another person confessing to the shooting logically showed

---

[6] "One of the fundamental guaranties of life and liberty is found in the sixth amendment of the constitution of the United States, which provides that 'in all criminal prosecutions the accused shall * * * be confronted with the witnesses against him.' Instead of confronting Kirby with witnesses to establish the vital fact that the property alleged to have been received by him had been stolen from the United States, he was confronted only with the record of another criminal prosecution, with which he had no connection, and the evidence in which was not given in his presence." Kirby, 174 U.S. at 55 (alteration in original).

11

that Chambers was not the shooter. But in the context here of an ongoing altercation involving Miles, Craig, and Ed, the fact that Craig at some point assaulted Ed is not logically evidence that Miles did not assault him.[7] Evidence of Craig's conviction lacked any tendency to establish Miles's guilt or innocence.

To the extent Craig's plea is minimally relevant for demonstrating the parents' bias in favor of Craig, ER 403 presents a tenable basis for exclusion. The court reasonably determined the evidence establishing Craig's guilt was not probative of Miles's guilt or innocence. Admitting Craig's plea would have risked creating a false dichotomy for the jury based on a faulty inference—if Craig committed assault, then Miles could not have also committed assault. Even if the plea contained minimal probative value in relation to Ed's and Kay's credibility, the trial court could tenably conclude this was substantially outweighed by an unfair risk of misleading the jury. ER 403.

We hold the superior court did not abuse its discretion when refusing to admit the fact Craig pleaded guilty.

2

We next turn to Craig's written testimony accompanying his plea documents that recounted the fight, which the court excluded as "that amount of detail of a testimonial nature wouldn't be appropriate to be admissible over a hearsay objection under RCW 5.44.010."

---

[7] Compare Washington's "other suspect evidence" doctrine, which "focuses on whether the evidence offered tends to create a reasonable doubt *as to the defendant's guilt, not whether it establishes the guilt of the third party* beyond a reasonable doubt." State v. DeJesus, 7 Wn. App. 2d 849, 866, 436 P.3d 834 (2019) (emphasis added).

"Out-of-court statements 'offered in evidence to prove the truth of the matter asserted' are hearsay," State v. Mohamed, 186 Wn.2d 235, 241, 375 P.3d 1068 (2016) (quoting ER 801(c)), and are "generally inadmissible," id. (citing ER 802). "The problem with allowing such testimony is that it places the defendant's version of the facts before the jury without subjecting [their witness] to cross-examination." State v. Finch, 137 Wn.2d 792, 825, 975 P.2d 967 (1999).

RCW 5.44.010 provides, "[R]ecords and proceedings of any court of the United States, or any state . . . are admissible in evidence in all cases in this state when duly certified by the attestation of the clerk." RCW 5.44.040 similarly states, "Copies of all records and documents on record or on file in the offices of the various departments of the United States and of this state . . . , when duly certified by the respective officers having by law the custody thereof, . . . must be admitted in evidence in the court of this state." The "admissibility requirement of RCW 5.44.010 is similar to the public records rule, RCW 5.44.040." State v. James, 104 Wn. App. 25, 32-33, 15 P.3d 1041 (2000). "[A]lthough the rules within chapter 5.44 RCW appear facially as only rules of authenticity, our Supreme Court has specifically held that RCW 5.44.040 codifies the common law public records exception to the hearsay rule." Id. at 33. To be admitted, court records must not only comply with RCW 5.44.010, but must also contain facts rather than conclusions involving discretion or expression of opinion. Id.

In James, this court noted a clerk's minutes could fall under RCW 5.44.010, but that a prosecutor's declaration could not as it "contains the prosecutor's own legal conclusion based upon facts that the prosecutor asserts to be true." Id.

Further, the prosecutor in James acted "as an advocate, not as a neutral public official" or "record keeper." Id. at 34. "With all public records, trustworthiness exists because of the declarant's official duty and high probability that the declarant has performed his public duty to make an accurate record." Id.

Here, the State concedes Craig's judgment and sentence is a qualifying public record. But as described above, the court acted within its discretion in ruling that the fact Craig pleaded guilty was not relevant to determine Miles's guilt or innocence. And the remaining parts of the statement of defendant on plea of guilty—Craig's narrative account of the fight—do not meet the hearsay exceptions of RCW 5.44.010 or RCW 5.44.040.

The plea statement is an out-of-court statement. Craig does not assert facts pursuant to an official duty and from a neutral, objective perspective. Instead, he does so to argue a conclusion that "I believe I am guilty of assault 4 because while I punched my father to defend [Miles], once she was safe from him, I continued to punch him." Craig's written testimony is more akin to the prosecutor's declaration than the clerk's minutes discussed in James. We hold Craig's written testimony is not a qualifying public record. In turn, the court did not abuse its discretion by ruling the "testimonial" portions of Craig's plea documents were not public records and inadmissible as hearsay.

D

A defendant's right to present a defense is not unlimited and "the Constitution permits judges to 'exclude evidence that is repetitive . . . , only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion

14

of the issues.' "   Jennings, 199 Wn.2d at 63 (alteration in original) (internal quotation marks omitted) (quoting Holmes v. South Carolina, 547 U.S. 319, 326-27, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)).  We review "de novo whether the exclusion of evidence violated the defendant's constitutional right to present a defense." Id. at 58.  We employ a balancing test, where if "the evidence is relevant, the reviewing court must weigh the defendant's right to produce relevant evidence against the State's interest in limiting the prejudicial effects of that evidence to determine if excluding the evidence violates the defendant's constitutional rights." Id. at 63.  We draw "a distinction between evidence that *merely bolsters* credibility and evidence that is *necessary* to present a defense."   Id. at 66-67 (emphasis added).

Miles's testimony detailed her and Craig's actions during the fight, such as claiming Craig "flew out of the car" and "pull[ed] his dad off me, and took him to the ground" before "punching him."  Excluding Craig's conviction did not limit her ability to present evidence of Craig's actions.  Further, the court admitted Kay's 911 calls and permitted them to be played for the jury at trial.  Therein, Kay repeatedly discussed Craig's role in the fight, stating Craig was "beating" Ed before "holding him down on the ground" while "hit[ting] him in the head."  Craig's plea statements were cumulative of Miles's testimony and the 911 calls and merely served to bolster her credibility.

The court also expressly permitted Miles to ask Craig's parents about their relationship with their son and potential biases arising from it, including asking about their reluctance to testify against Craig.  Miles directly asked both Ed and

15

Kay whether they were relieved to not have to testify against Craig, to which each answered affirmatively. Thus, Miles was allowed to show the potential bias of the parents, and the additional fact of Craig's conviction would have been cumulative.

Even if Craig's plea documents were relevant, their exclusion did not deprive Miles of "the ability to testify to [her] version[] of the incident." Jennings, 199 Wn.2d at 66. Because of the risk of Craig's plea statement misleading the jury and the risk of allowing inadmissible hearsay not meeting a hearsay exception, Miles's interest in presenting this evidence was "counterbalanced by the state's interest in seeing that the evidence is not so prejudicial as to disrupt the fairness of the fact-finding process." State v. Hudlow, 99 Wn.2d 1, 15, 659 P.2d 514 (1983).

We hold the court's exclusion of Craig's plea did not violate Miles's right to present a defense.

III

Miles next argues the court erred when it refused to dismiss the State's domestic violence designations for both charges. She claims the designations were not legally viable based on the evidence presented, arguing the designations served only to unfairly prejudice the jury against her.[8] When a defendant challenges the sufficiency of the evidence, the evidence must be viewed in the

---

[8] The State argues Miles failed to preserve this issue on appeal and invited error by proposing the special verdict forms used by the court. See State v. Kelly, 25 Wn. App. 2d 879, 885, 526 P.3d 39 (2023) ("[A] defendant that erroneously requests a jury instruction may not then appeal the instruction."), aff'd, 4 Wn.3d 170, 561 P.3d 246 (2024). We disagree with both contentions. Miles moved to dismiss the designations for insufficient evidence. Miles thus raised the issue and argued to the trial court that it should not submit the issue to the jury.

light most favorable to the State. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

For both assault charges, the State alleged "Miles, at the said time of committing the above crime against a family or household member as defined in [former] RCW 26.50.010(6) [2019], which is a crime of domestic violence as defined in RCW 10.99.020." In 2021, the legislature recodified RCW 26.50.010(6) as RCW 10.99.020(7). LAWS OF 2019, ch. 263, § 204; LAWS OF 2021, ch. 215, §§ 121, 170. Former RCW 26.50.010(6) stated, " 'Family or household members' means: (a) Adult persons related by blood or marriage; (b) adult persons who are presently residing together or who have resided together in the past; and (c) persons who have a biological or legal parent-child relationship, including stepparents and stepchildren and grandparents and grandchildren." It is undisputed Miles and the parents are not related by blood and never resided together. The only avenue for proving the domestic violence designations was to prove Miles and Craig were married.

After the State rested, Miles unsuccessfully moved to dismiss the State's domestic violence allegations for a "lack of sufficient evidence." The court denied Miles's motion as "the witnesses and at least [Kay] last testified that—that she heard from the couple that they were married and that Ms. Davis wore a wedding ring, and that they had this longstanding relationship with their children living together." This was "evidence from which a jury can find that they were married" when viewed "in the light most favorable to the State."

17

The State elicited testimony from the parents that Craig and Miles wore rings, presented themselves as married, and lived together. The parents also testified that they mistakenly believed Craig and Miles were married. In addition, however, the State also elicited unobjected-to testimony from the parents that Craig and Miles told them they were married. This included Ed testifying, "They told us they [were] married," and Kay testifying, "I know they told us that they had gotten married." When viewed in the light most favorable to the State, Craig and Miles's statements that they were married was some evidence from which any rational trier of fact could conclude they were married. The superior court did not err by denying the motion to dismiss the domestic violence designations.[9]

IV

Miles finally argues the court violated the real facts doctrine by improperly considering numerous statements from individuals "wholly unrelated to the incident" when imposing her sentence. (Emphasis omitted.) Miles urges the "court admitted this negative input 'has made an impression on the Court' " and also "said this information 'received some consideration' when sentencing her."

---

[9] Further, any error was harmless. The jury answered "no" on both special verdict forms, undermining Miles's claim that these designations prejudiced the jury against her. State v. Bryant, 89 Wn. App. 857, 868, 950 P.2d 1004 (1998) ("That the jury convicted Bryant of a lesser offense than robbery does not require the conclusion that Bryant was prejudiced by the joinder. If anything, the jury's verdict demonstrates a lack of prejudice in that the jury clearly did not infer guilt of robbery in the second degree based on the evidence of bail jumping."). And ample evidence supported Miles's assault convictions. This included the in-depth testimony of both parents, as corroborated by both of Kay's 911 calls, and photos of the parents' injuries and the area around the driveway soon after the fight. The above evidence is not overridden by isolated mentions of "domestic violence" at trial.

The real facts doctrine originates from Washington's Sentencing Reform Act of 1981 (SRA), specifically RCW 9.94A.530(2), State v. Morreira, 107 Wn. App. 450, 458, 27 P.3d 639 (2001), which the legislature recodified from RCW 9.94A.370. LAWS OF 2001, ch. 10, § 6. RCW 9.94A.530(2) states that "[i]n determining any sentence other than a sentence above the standard range, the trial court may rely on no more information than is admitted by the plea agreement, or admitted, acknowledged, or proved in a trial or at the time of sentencing, or proven pursuant to RCW 9.94A.537."[10] "Where the defendant disputes material facts, the court must either not consider the fact or grant an evidentiary hearing on the point." RCW 9.94A.530(2).

At sentencing, the court noted the State submitted letters from numerous individuals, including Ed and Kay, Miles's two daughters, Miles's son, Miles's sister, Miles's ex-husband, Craig's sister, Ed and Kay's granddaughter, Craig's ex-wife, and Miles's former landlord, each alleging Miles previously mistreated them. At the hearing itself, Miles's sister, Miles's daughters, and Kay spoke on similar subjects.

Miles partially objected to the statements by contesting their reliability. Specifically, she acknowledged they "paint a pretty grim picture" from "many years ago," but urged none "of the citations are—are proven cases" and "a lot of the allegations we're talking about are—are ten years old, 12 years old," such as "talking about a 2002 civil case" and "a 2007 divorce."

---

[10] RCW 9.94A.537 concerns exceptional sentences above the standard range and is immaterial to Miles who received a standard range sentence.

19

But Miles also expressly relied on some of these statements in her arguments concerning mental health treatment. She urged that "[e]verybody seems to agree that [she] needs mental health care" as "[t]hat's in the letters provided by the State to the Court directly in the State's presentation." Miles made these statements a key theme of her argument, urging the "letters that were submitted to the Court also are very clear that there's underlying mental health issues dating back to her childhood" and have been "a big problem for her since she was a kid that's never been resolved."

The court explained it did not consider the challenged statements when determining the length of Miles's sentence:

> I want to be clear that I'm not acting out of animus towards [Miles]. And I know there has been a lot of animus in the materials that the Court has considered. As [Miles's attorney] acknowledged, it is an astounding amount of negative input, really, from people in different parts of [Miles]'s life.
>
> It has made an impression on the Court. I have not seen this before. But I want to underscore something that [Miles's attorney] said, which is *I'm not here to sentence Ms. Miles about things from the past. That is not part of my sentence.*
>
> And so *the extent that the letters revealed kind of character and information for the Court to consider about ability to follow recommendations*, you know, that received some considerations. *But I am not here to punish Ms. Miles for the past.*
>
> I am here to effectuate a fair sentence *based on the really egregious assaults of Ed and Kay Davis*. And, you know, I was here for all of that and I heard about it. I received the jury's verdict.

Essentially in line with Miles's request to consider the statements as bearing on her need for mental health treatment, the court only considered the challenged statements when determining her ability to follow recommendations. Miles's

narrow focus on the court explaining these statements " 'made an impression' " or " 'received some considerations' " overlooks that the full context shows the court appropriately considered the statements only for a proper purpose in line with Miles's own reliance on them for that purpose.

Affirmed.

_Birk, J._

WE CONCUR:

_Chung, J._          _Házy_